**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **L.B., by his Parents R.B. and M.B.,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| **v.** | : | |
| | : | |
| **RADNOR TOWNSHIP SCHOOL** | : | |
| **DISTRICT,** | : | **No. 20-1768** |
| **Defendant.** | : | |

## MEMORANDUM

Schiller, J.                                                                                       April 1, 2021

This case is about a school district's evaluation of a child with disabilities for potential provision of gifted educational services under Pennsylvania law. Plaintiff L.B., by and through his parents ("Plaintiff" or "Parents"), filed an administrative due process complaint against Radnor Township School District ("Radnor" or "the District") for violations of the Individuals with Disabilities Education Act ("IDEA"), Section 504 of the Rehabilitation Act of 1973 ("RA"), and the Americans with Disabilities Act ("ADA"). The due process hearing officer ruled in favor of the District. The hearing officer concluded that Parents failed to prove Radnor discriminated against L.B. because of a disability or deprived L.B. of a free and appropriate public education when it determined that L.B. was not eligible for gifted educational services.

Plaintiff seeks judicial review of the due process hearing officer's decision. Neither party requested to submit additional evidence to the Court, and both sides now move for judgment on the administrative record. For the reasons that follow, the District's motion will be granted, and Plaintiff's motion will be denied.

## I.     FACTUAL BACKGROUND

L.B. is a student with autism and a speech and language impairment who is eligible to

receive special education and related services in the Radnor Township School District, a local education agency which receives federal financial assistance. (Ex. 2, Hearing Officer's Findings of Fact [Hr'g FOF] ¶¶ 4-7.) L.B. was born prematurely and was hospitalized frequently in early childhood. (*See* Ex. 3, Transcript of Hearing [Tr.] 102:7-25.) L.B. started treatment and medication for attention-deficit/hyperactivity disorder (ADHD) and anxiety in September 2018. (Tr. 93:6-20, 95:20-96:1.)

L.B. was in second grade in the 2017-2018 school year. Beginning in November 2017, L.B. had an Individualized Education Plan ("IEP") that included a paraprofessional aide to assist him throughout the day with on-task behavior. (Ex. S-24 at 23; Ex. S-43 at 6.) L.B.'s second grade IEP also included a goal to increase his time spent on task to be within 10% of a non-disabled peer. (Ex. S-24 at 17.) This goal was implemented through a positive behavior chart and reward activities in L.B.'s classroom. (Ex. S-24 at 10, 24; *see* Tr. 50:1-54:18.) L.B. made progress toward this goal for on-task behavior between November 2017 and February 2018; he started at a baseline of staying on task within 32% of a non-disabled peer in November and by February had improved to an observed rate of staying on task within 22% of a non-disabled peer. (Ex. S-38 at 3; Hr'g FOF ¶ 31.) However, a progress report dated June 8, 2018 reflected that he was on task at a rate of 34% as compared to non-disabled peers. (Ex. S-38 at 4.)

### A.  The District's Gifted Educational Services Evaluation of L.B.

At the end of second grade, L.B.'s classroom teacher, Rachel Fisher, referred him to be evaluated for gifted educational services. (Hr'g FOF ¶ 11; Tr. 56:19-22.) Fisher testified that she referred L.B. for gifted evaluation because he was reading above grade level and showed signs of creativity. (Tr. 59:18-60:8.) L.B.'s parents had not requested a gifted evaluation. (Hr'g FOF ¶ 11; Tr. 123:24-124:1.) To determine whether to refer L.B. for a full gifted evaluation, the District

2

completed a screening tool called the Gifted Referral and Identification Summary. (Ex. S-37.) The summary included standardized test scores, a parent input form, and a scored screening tool called the Scales for Identifying Gifted Students (SIGS). (Ex. S-37 at 2-3, 7-14.) Fisher completed the SIGS, which involved numerically rating L.B.'s performance across variables in seven areas: general intellectual ability, language arts, mathematics, science, social studies, creativity, and leadership. (Hr'g FOF ¶ 14; Ex. S-37 at 11-14.) Although L.B. received a relatively low score on the Gifted Referral and Identification Summary, which would normally not result in a student qualifying for a gifted evaluation, the District referred L.B. for a gifted evaluation. (Hr'g FOF ¶¶ 14-15; Ex. S-37 at 6.)

L.B.'s parent gave written consent for the District to begin a gifted multidisciplinary evaluation on June 15, 2018. (Ex. S-36.) Prior to the evaluation, the District neuropsychologist, Dr. Maria Schreiber, conducted a classroom observation of L.B., confirmed the testing date with L.B.'s teacher, reviewed L.B.'s IEP, and reviewed the manual for testing students with autism. (Hr'g FOF ¶¶ 17-18; Ex. S-43 at 6; Tr. 179:13-182:19.) On June 18, 2018, Schreiber administered to L.B. an IQ test called the Wechsler Intelligence Test for Children-Fifth Edition (WISC-V). (Ex. S-43 at 8.) During the IQ test, Schreiber implemented a number of accommodations including dimming lights, making available snacks and fidgets, allowing movement breaks, and conducting the test in two sessions. (Hr'g FOF ¶ 18; Tr. 178:21-179:12, 182:20-184:20.) L.B. appeared excited and engaged during the IQ test and inattention did not impact his testing. (Hr'g FOF ¶ 19; Tr. 186:7-187:10, 225:23-226:8.) L.B.'s test results were 123 on the full scale IQ, and 125 on the General Ability Index, which is a scoring system designed to eliminate the impact of inattention, working memory, and processing speed. (Hr'g FOF ¶ 20; Ex. S-43 at 8; Tr. 192:8-193:15.) These scores are in the very high range. (Ex. S-43 at 8.)

Radnor issued L.B.'s gifted evaluation report in the fall of 2018. (Hr'g FOF ¶ 20; Ex. S-43 at 8-11.) The report includes L.B.'s IQ test scores, standardized test scores, notes of the classroom teacher's observations, summaries of L.B.'s academic performance in the classroom, and the SIGS ratings. (Ex. S-43 at 8-11.) Schreiber met with each member of the gifted evaluation team individually, except for L.B. parents, before writing the gifted evaluation report. (*See* Tr. 195:19-197:11.) The report contains several sections summarizing other criteria assessed in the gifted evaluation beyond IQ test scores. The most relevant sections are:

1. "Achievement Test Scores," which describes standardized test scores in the 96th percentile for reading and 74th percentile for math. It also states L.B.'s "reading is instructional above grade level by one year or more but not two full years above grade level." (Ex. S-43 at at 9.)

2. "Rates of Acquisition and Retention," which states that based on Fisher's observations, L.B. "requires as frequent repetitions or practices in order to show competency and achieves mastery of skills and concepts in the classroom more quickly compared to his classmates." (*Id.*)

3. "Achievement, Performance and/or Expertise in One or More Academic Areas [ ]as evidenced by excellence of products, portfolio, or research," which includes descriptions for L.B.'s reading, math, and writing based on Fisher's observation and benchmark assessments. In reading, L.B. is "exceeding grade level expectations." L.B. "demonstrates reading and comprehension for above level texts[,]" and contributes to book club, but "could have trouble attending to the conversation due to distractibility." He also "likes to seek out information on his own through reading and benefits from higher level questioning." In math, L.B. is "meeting grade level expectations" and is

"quick with computation and demonstrates strong problem solving skills, but has difficulty explaining his thinking or showing the process." In writing, L.B. earned a proficient rating on all three benchmark assessments, "loves to write creatively, [ ] always shows creativity in his writing[,]" and "demonstrates strong vocabulary, voice, and command of the English language." (*Id.* at 9-10.)

4.  "Learning Strengths including specialized skills, interests and aptitudes," which includes L.B.'s SIGS ratings. On the SIGS, Fisher's numerical ratings resulted in L.B. scoring in the range of likely to be gifted in creativity; somewhat likely to be gifted in mathematics; and average in general intellectual ability, language arts, science, social studies, and leadership. (*Id.* at 10; *cf.* Ex. S-37 at 11-14.) This section also notes that L.B.'s vocabulary is "very strong for his age and grade[,]" and his IQ verbal comprehension subtests score was in the extremely high range. (Ex. S-43 at 10.)

5.  "Indicate any intervening factors which may mask gifted abilities [ ]such as . . . learning disability, physical impairment, emotional disability," which describes the input of L.B.'s parents that L.B.'s "attention to task, tolerance for frustration, can spike challenges." It also states that teacher observations suggest L.B.'s "attention and persistence to task are the greatest factor interfering with his learning and productivity. He has not been able to demonstrate a consistent need for enrichment even in the areas of preferred interest or academic strength because he struggles to maintain his engagement to show academic need." (*Id.* at 11.)

The gifted evaluation report concluded that L.B. was "doing well academically and has a particular strength in reading, is a creative writer and competent math student. However, his academic achievement does not show educational needs beyond those available within the regular

education enrichment opportunities." (*Id.*) Therefore, the report concluded L.B. did not qualify for gifted education. (*Id.*)

Schreiber informed L.B.'s parents of the gifted evaluation results by letter dated September 28, 2018. (Ex. P-2.) After summarizing the IQ results, the letter explained,

> "a student who is reading one or two years above grade level but has no other needs can be accommodated within the regular education classroom. The same holds true for math or writing in isolation; however, if a student's needs are . . . multiple areas of advanced performance[ ], then the student will need a gifted educational plan."

(*Id.*) Following an IEP meeting in October 2018, L.B.'s IEP team adopted the recommendation of the gifted evaluation report, and L.B.'s proposed third grade IEP did not include gifted education. (Hr'g FOF ¶¶ 27, 30; Ex. S-45 at 7; Ex. S-46 at 2.) Parents did not request another gifted evaluation for L.B. (Tr. 145:23-147:8, 197:12-15, 232:12-14.)

## B. The Due Process Hearing

Plaintiff filed an administrative complaint in September 2019 alleging that Radnor's denial of gifted education services to L.B. in October 2018 violated the IDEA, RA, and ADA. (Ex. S-49.) At the due process hearing, the hearing officer admitted over fifty exhibits into evidence and heard live testimony from L.B.'s second grade teacher, Fisher; the district neuropsychologist who administered the gifted evaluation, Dr. Schreiber; L.B.'s parents; L.B.'s treating psychiatrist, Dr. Fahad Ali; and the school principal, Dr. Tronya Boylan. The hearing officer did not decide the ADA claim, reasoning that the administrative tribunal lacked jurisdiction over ADA claims. (Ex. 2, Hearing Officer's Decision [Hr'g Decis.] at 18.) The hearing officer issued a decision in favor of the District on the RA and IDEA claims. (*Id*. at 11-17.)

### 1. The RA Claim

The hearing officer determined that the evidence did not support Parents' contention that

the District failed to provide "appropriate accommodations" during L.B.'s evaluation for gifted services. (*Id.* at 14.) The hearing officer pointed to Schreiber's significant experience assessing students for giftedness, including students with autism, and the accommodations she made during the IQ test, such as allowing L.B. to take movement breaks, reducing brightness, breaking the test into two sessions, testing on an iPad, and providing fidgets, snacks, and gum. (*Id.* at 14-15.) Regarding the SIGS rating scale, the hearing officer decided it was "appropriate", but also concluded "even assuming arguendo that there were issues with the screening instrument, the fact that the student received a full evaluation for gifted eligibility moots any potential issues with the screening." (*Id.* at 16.) The hearing officer found Parents' evidence concerning L.B.'s sibling and Radnor's alleged systemic disparate treatment of denying gifted education to students with disabilities to be speculative and insufficiently supported. (*Id.* at 16.) Finally, the decision concluded that the testimony of the District's staff "was more credible and persuasive than the testimony of the parents and their witness . . . ." (*Id.* at 17.)

### 2.  *The IDEA Claim*

The hearing officer concluded Parents did not prove Radnor had denied L.B. a free and appropriate public education, in violation of the IDEA, by either (1) failing to find L.B. eligible for gifted services, (*Id.* at 11-12) or (2) "failing to provide services that would prevent the student's disability from masking the student's potential giftedness." (*Id.* at 13.) The decision stated that parents had "not produced any evidence linking the alleged lack of progress concerning time on task to the potential masking of giftedness by the student's disability." (*Id.*) The hearing officer found that Schreiber "testified credibly and persuasively" that she "reviewed the testing manual to ensure that the student's disabilities would not affect or mask giftedness." (*Id.* at 12.) The hearing officer also found Schreiber's and Fisher's testimony "credible and persuasive" that "the student's

IEP was implemented, [and] the student's attention issues did not adversely affect the district's assessments . . . ." (*Id.* at 13.) Testimony of the school district's staff was more credible and persuasive than the testimony of the parents and their witness "because of the demeanor of the witnesses," and the fact that L.B.'s mother's testimony concerning inability to provide input to school officials was "refuted by the documentary evidence . . . ." (*Id.* at 13-14.) The hearing officer concluded "[t]he parents have not established that the student's IEP was not reasonably calculated to provide benefit in view of the student's circumstances." (*Id.* at 13.)

## II.    STANDARD OF REVIEW

Parents filed a Complaint in this Court seeking review of the hearing officer's administrative decision, pursuant to 20 U.S.C. § 1415(i)(2). In reviewing a special education hearing officer's administrative decision, the Court employs a modified *de novo* review. *S.H. v. State-Operated Sch. Dist. of City of Newark*, 336 F.3d 260, 270 (3d Cir. 2003). "Factual findings from the administrative proceedings are to be considered prima facie correct. If a reviewing court fails to adhere to them, it is obliged to explain why." *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 268 (3d Cir. 2012) (internal quotations omitted). In considering testimony, "a District Court must accept the state agency's credibility determinations unless the non-testimonial, extrinsic evidence in the record would *justify* a contrary conclusion. In this context the word 'justify' demands essentially the same standard of review given to a trial court's findings of fact by a federal appellate court." *Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004) (internal quotations omitted). "Within the confines of these standards, a district court is authorized to make findings based on the preponderance of the evidence and grant the relief it deems appropriate." *M.R.,* 680 F.3d at 268 (quoting *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010)). Plaintiff bears the burden of persuasion as the party challenging the administrative

decision. *Id.* at 270. Plaintiff also had the burden of persuasion in the due process hearing as the party seeking relief. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005).

### III.   DISCUSSION

The hearing officer determined that Plaintiff failed to prove Radnor discriminated against L.B. because of his disability or deprived him of a free and appropriate public education when it determined he was not entitled to gifted educational services under Pennsylvania law. First, the Court must review the Pennsylvania standards for gifted education. Then, the Court will consider whether Plaintiff has proven a violation of the RA, ADA, or IDEA. Upon review of the administrative record, and affording due weight to the hearing officer's factual findings, the Court agrees that Plaintiff has not proven such violations.

#### A.   Eligibility for Pennsylvania's Gifted Educational Services

The State Board of Education regulations dictate how Pennsylvania school districts provide gifted educational services and identify students who are thought to be gifted. 22 Pa. Code § 16.1 *et. seq.* A student must be referred for a gifted evaluation if the school district's screening indicates the student may be gifted or if a parent makes a request for a gifted screening, with a limit of one request per school term. *Id.* § 16.22(b)-(c).

After a student is referred, the school must conduct a gifted multidisciplinary evaluation and prepare a written report that sets forth a recommendation as to "whether the student is gifted and in need of specially designed instruction . . . ." *Id.* § 16.22(h). A school district's procedure for a gifted multidisciplinary evaluation "must be sufficient in scope and depth to investigate information relevant to the student's suspected giftedness, including academic functioning, learning strengths and educational needs." *Id.* § 16.22(e). "Indicators of giftedness should be drawn from a wide variety of sources." Pa. Dep't of Educ., Gifted Educ. Guidelines [Guidelines], last

revised May 2014, at 13. The evaluation "may include, but is not limited to, information from: [a]bility tests; [n]ationally normed individualized standardized achievement assessments; [c]lass-work samples; [c]urriculum based assessments; [c]umulative review tests; [p]erformance based skills as demonstrated in portfolios, products, competitions or other demonstration of skills; [t]eacher observation; [n]oteworthy achievements; [and] [p]arental input[.]" *Id.*

The definition of a "gifted" student is murky for students with IQ test scores below 130. The relevant regulations state:

> (d) Each school district shall establish procedures to determine whether a student is mentally gifted. This term includes a person who has an IQ of 130 or higher or when multiple criteria as set forth in this chapter and in Department Guidelines indicate gifted ability. Determination of gifted ability will not be based on IQ score alone. Deficits in memory or processing speed, as indicated by testing, cannot be the sole basis upon which a student is determined to be ineligible for gifted special education. A person with an IQ score lower than 130 may be admitted to gifted programs when other educational criteria in the profile of the person strongly indicate gifted ability. Determination of mentally gifted must include an assessment by a certified school psychologist.
>
> (e) Multiple criteria indicating gifted ability include:
>> (1) A year or more above grade achievement level for the normal age group in one or more subjects as measured by Nationally normed and validated achievement tests able to accurately reflect gifted performance. Subject results shall yield academic instruction levels in all academic subject areas.
>> (2) An observed or measured rate of acquisition/retention of new academic content or skills that reflect gifted ability.
>> (3) Demonstrated achievement, performance or expertise in one or more academic areas as evidenced by excellence of products, portfolio or research, as well as criterion-referenced team judgment.
>> (4) Early and measured use of high level thinking skills, academic creativity, leadership skills, intense academic interest areas, communications skills, foreign language aptitude or technology expertise.
>> (5) Documented, observed, validated or assessed evidence that intervening factors such as English as a second language, disabilities defined in 34 CFR 300.8 (relating to child with a disability), gender or race bias, or socio/cultural deprivation are masking gifted abilities.

22 Pa. Code § 16.21(d)-(e). The Guidelines summarize that "[i]f a student's IQ is less than 130, other factors, such as academic performance, demonstrated achievement or other observed skills

must strongly indicate gifted ability in order for that student to be identified as gifted . . . ." Guidelines at 7. For the fifth "multiple criteria," the Department Guidelines further explain that "[b]ecause disabilities and bias factors may mask gifted abilities, districts are required to examine discrepancies between ability assessment results and academic achievement or demonstrated skills, and discrepancies among ability subtests." *Id.*

Parents argue that the hearing officer committed an error of law by relying on *E.N. v. M. Sch. Dist.*, 928 A.2d 453, 465-66 (Pa. Commw. Ct. 2007) for the proposition that a school district has discretion whether to provide gifted education to a child with an IQ score below 130. (Pl.'s Mem. of Law in Supp. of Parents' Mot. for J. on the R. [Pl.'s Mot.] at 29; Pl.'s Resp. to Def.'s Mot. for J. on the Administrative R. [Pl.'s Resp.] at 14-16.) Parents argue that the decision in *E.N.* relied on an older version of the regulations that deemed an individual gifted who had an IQ of at least 130 *and* multiple criteria indicated gifted ability, whereas the current regulations, which were amended in 2008, make those requirements disjunctive. *See* 22 Pa. Code § 16.21(d) (gifted "includes a person who has an IQ of 130 or higher *or* when multiple criteria . . . indicate gifted ability.") (emphasis added); *compare* 38 Pa.B. 5953 (Nov. 1, 2008), *with* 37 Pa.B. 4872 (Sept. 8, 2007). While the court in *E.N.* did cite to this outdated version of the regulations, it also analyzed the provision stating that a person with an IQ score below 130 "*may* be admitted to gifted programs when other educational criteria in the profile of the person strongly indicate gifted ability[,]" which remains unchanged in the current regulations. *See* 928 A.2d at 465 (quoting 22 Pa. Code § 16.21(d)). Moreover, the court in *E.N.* noted the subjectiveness in determining whether a student "displays sufficient multiple criteria" to indicate giftedness when the student has some characteristics that suggest giftedness while others do not. *Id.* at 466. This too remains a facet of the current regulations. There is no set formula to determine what percentage of the "multiple

11

criteria" must indicate giftedness, or at what point other criteria "strongly indicate" gifted ability. 22 Pa. Code § 16.21(d)-(e).

Even if the hearing officer had made an error of law in relying on *E.N.*, the error would be harmless. L.B.'s gifted evaluation report assessed each of the enumerated "multiple criteria" in the regulations § 16.21(e)(1)-(5): (1) grade level achievement as measured by standardized testing performance, (2) rates of retention or acquisition, (3) achievement in academic areas, (4) skills such as creativity, and (5) evidence that disability was masking giftedness. (Ex. S-43 at 9-11.) There is no indication the District refused to consider multiple criteria besides IQ score or denied gifted education to L.B. despite a conclusion that these multiple criteria indicated giftedness. Rather, the District evaluated these multiple criteria and determined, on the whole, that they did not indicate L.B.'s need for gifted education.

## B.  The RA and ADA Claims

Plaintiff contends that Radnor discriminated against L.B. based on disability by failing to make reasonable accommodations or modifications to its evaluation for gifted educational services. The RA and ADA prohibit disability discrimination by, respectively, programs that receive federal financial assistance and public entities. *See* 29 U.S.C. § 794(a); 42 U.S.C. § 12132. Radnor meets these criteria. (*See* Hr'g FOF ¶¶ 6-7.)

"To prove a claim under either the ADA or RA, [p]laintiffs must show that: (1) they are handicapped or disabled as defined under the statutes; (2) they are otherwise qualified to participate in the program at issue; and (3) they were precluded from participating in a program or receiving a service or benefit because of their disability." *CG v. Pennsylvania Dep't of Educ.*, 734 F.3d 229, 235 (3d Cir. 2013). The parties do not dispute that L.B. qualifies as disabled under these statutes, in satisfaction of the first element. *See* 42 U.S.C. § 12102(1)-(2); 29 U.S.C. § 705(20)(B). The

heart of the dispute in this case is whether L.B. was otherwise qualified to participate in gifted educational services. Ordinarily, under RA Section 504, a school-aged child with disabilities is an otherwise qualified individual for purposes of public elementary education. *See* 34 C.F.R. § 104.3(*l*)(2). While this makes L.B. eligible for public education, gifted education has additional eligibility criteria beyond those for enrollment in the school district. *See* section III.A *supra.* Therefore, L.B. must also be otherwise qualified to participate in gifted educational services by meeting "the essential eligibility requirements" for such services. 34 C.F.R. § 104.3(*l*)(4).

"An otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap." *SE Comm. Coll. v. Davis*, 442 U.S. 397, 406 (1979). However, if a qualified individual has been excluded from a federally funded program because of a disability, the program is affirmatively required to make "reasonable accommodations" when necessary to assure the qualified individual is provided "meaningful access to the benefit . . . ." *Alexander v. Choate*, 469 U.S. 287, 301 (1985). Thus, an individual is "otherwise qualified" under the RA Section 504 if reasonable accommodations of the person's disability would enable him or her to meet the essential eligibility requirements. *See Pottgen v. Missouri State High Sch. Activities Ass'n*, 40 F.3d 926, 929 (8th Cir. 1994). The ADA similarly defines a "qualified individual with a disability" as one who "with or without reasonable modifications to rules, policies, or practices … meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

Whether a requested accommodation is "reasonable" depends on the facts of each particular case. *Nathanson v. Med. Coll. of Pa.*, 926 F.2d 1368, 1385 (3d Cir. 1991). In the context of a disabled student, "a school district must reasonably accommodate the needs of the handicapped child so as to ensure meaningful participation in educational activities and

meaningful access to educational benefits." *M.R.*, 680 F.3d at 280. While school districts are required to reasonably accommodate a student with disabilities, they need not make substantial modifications to the criteria of their programs or provide every specific accommodation that parents request. *See id.* at 282. A "fundamental alteration in the nature of a program" is not required. *Choate*, 469 U.S. at 300 (quoting *Davis*, 442 U.S. at 410).

The Third Circuit has recently articulated that claims alleging failure to accommodate under the RA and the ADA involve the same three-part inquiry: (1) whether the requested accommodation is reasonable; (2) whether it is necessary; and (3) whether it would fundamentally alter the nature of the program. *Berardelli v. Allied Servs. Inst. of Rehab. Med.*, 900 F.3d 104, 123 (3d Cir. 2018); *see also* 28 C.F.R. § 35.130(b)(7)(i) (a public entity "shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.") The test for "reasonableness" of an accommodation or modification is the same under the RA and the ADA. *Berardelli*, 900 F.3d at 118. As a result, the Court will address Plaintiff's RA and ADA claims together.

First, the Court will describe the accommodations Parents argue should have been made to the gifted evaluation process. Second, the Court will consider whether those accommodations are reasonable and would make L.B. otherwise qualified. Finally, the Court will address Parents' circumstantial evidence of discrimination.

### 1. *Accommodations to L.B.'s Gifted Evaluation*

Parents did not request any accommodations for L.B. during the gifted multidisciplinary evaluation. Nevertheless, the District made multiple accommodations during L.B.'s IQ test to

mitigate any impact of his disabilities during the exam. Some of these accommodations were based on Dr. Schreiber's review of L.B.'s IEP, such as allowing movement breaks and conducting the test in two sessions. (*See* Tr. 182:20-184:20.) As a result, Schreiber testified that L.B.'s inattention did not impact his IQ test results. (*Id.* 225:23-226:8.) The District also incorporated L.B.'s higher GAI score of 125, which eliminates issues of inattention and processing speed, into his evaluation results. (*Id.* 192:8-193:15; Ex. S-43 at 8.)

Plaintiff disagrees that many of the District's accommodations on the IQ test were appropriate or necessary because they were not part of the specially designed instruction in L.B.'s IEP. (Pl.'s Resp. at 5-6 ¶¶ 14, 17-20; *see* Pl.'s Mot. at 26.) But Plaintiff has not suggested that these accommodations in any way hindered or disadvantaged L.B. Nor have Parents suggested any other accommodations that should have been employed for L.B. during the IQ test. The only substantive complaint parents raise about the IQ test is that they did not receive advanced notice of the testing date, so they could not ensure L.B. was well rested on the date of the test. (Pl.'s Mot. at 10 ¶ 32.) But Schreiber testified that L.B. appeared "excited and engaged" during the IQ testing, and she believed he tested to the best of his abilities. (Tr. 186:7-187:10.)

Parents do not offer any other examination results to show that L.B. has ever achieved an IQ test score of 130 or higher. Parents also did not request that the District retest L.B. on a different date or with any other testing accommodations. (Tr. 145:23-147:8, 197:12-15, 232:12-14.) It seems parents concede that L.B. was not otherwise qualified for gifted education based on an IQ score of 130 or higher. (*See* Pl.'s Resp. at 21.) Instead, Parents' argument focuses on Radnor's failure to make reasonable accommodations in its consideration of whether multiple criteria indicate gifted ability.

Parents seem to argue that the District should have provided two distinct reasonable

accommodations in its evaluation of other multiple criteria. First, Parents seek an evaluation that eliminates reliance upon "subjective opinions of staff that may be affected by stereotype or bias." (Pl.'s Mot. at 27.) Parents contend that the District's assessments of the other multiple criteria were inappropriate because they were not completed in a "measurable, objective fashion[,]" so its judgments were "subjective and impossible to verify." (*Id.* at 6 ¶ 26.) Plaintiff criticizes that the school's analysis of L.B.'s rates of acquisition were not documented with observed data or based upon a "measured rate," (*Id.* at 18) and the district's assessment of L.B.'s skills did not attempt to measure creativity with objective measures "such as Authentic Assessments or a Skills Inventory." (*Id.* at 19; *see* Pl.'s Resp. at 16-17.)

Second, Parents argue that the District failed to offer L.B. a reasonable accommodation of "eliminating or modifying items on the scale that do not measure intellectual ability or creativity but rather those manifestations of L.B.'s disabilities . . . ." (Pl.'s Mot. at 26.) Specifically, Parents argue the District should have eliminated the criteria regarding rates of retention or acquisition of new information because this criteria penalizes L.B.'s inattention and distraction. (*Id.* at 28.) Parents further argue that the SIGS rating scale discriminated against L.B. because it was not designed or tested for students with disabilities and gives disproportionate weight to factors other than general intellectual ability and creativity, thereby penalizing L.B. for exhibiting the effects of his disability. (Pl.'s Resp. at 10-12; Pl.'s Mot. at 8-9 ¶ 29, 10-11 ¶¶ 33-37.) Parents seem to argue that a reasonable accommodation would be the use of some other mechanism besides the SIGS to evaluate L.B.'s intellectual ability and creativity. (*See* Pl.'s Resp. at 16-17.)

The hearing officer found that "even assuming arguendo that there were issues with the [SIGS], the fact that the student received a full evaluation for gifted eligibility moots any potential issues with the screening." (Hr'g Decis. at 16.) The Court concludes that record evidence

contradicts this finding that any potential issue with the SIGS was irrelevant to the gifted evaluation or mooted by the gifted referral. Although the SIGS was used as a screening tool to determine whether L.B. should be referred for a gifted evaluation (Ex. S-37 at 3, 11-14), the results of the SIGS were also incorporated into the gifted evaluation report, which determined whether multiple criteria indicated L.B.'s gifted ability. (Ex. S-43 at 10.) Therefore, the Court finds the SIGS was a relevant methodology in the school district's gifted evaluation—for which the parents could have requested a reasonable accommodation.

Notably, Parents did not request any of the accommodations they now suggest either before, during, or after the school's gifted multidisciplinary evaluation. Parents never notified the District that they believed it needed to modify the types of data and criteria the gifted evaluation assessed as a reasonable accommodation of L.B.'s disability. Public entities have an obligation to make reasonable accommodations for students they know or reasonably should know are disabled. *See Nathanson*, 926 F.2d at 1383 (3d Cir. 1991). There is no dispute that the District was aware L.B. is a person with disabilities as defined by these statutes. As a result, the District made various reasonable accommodations for a student with L.B.'s disability during the IQ test. At that point, did the burden shift to Parents to inform the District that additional accommodations were necessary in the gifted evaluation? Neither party has addressed this issue in its briefing.

If the need for any additional accommodation was not obvious and not requested by Plaintiff, it is arguable that the District did not deny a reasonable accommodation in the gifted evaluation process. *See J.V. v. Albuquerque Pub. Sch.*, 813 F.3d 1289, 1299 (10th Cir. 2016) (denying ADA claim for failure to provide reasonable modification because student had "failed to request an accommodation or show that the need for an accommodation was obvious"); *cf. Leacock v. Temple Univ. Sch. Of Med.*, Civ. A. No. 97-7850, 1998 WL 1119866, at *4 (E.D. Pa. Nov. 25,

17

1998) ("For a school to be able to make reasonable accommodations for a student, it must have knowledge that such accommodations are required."). However, in certain instances, public entities must engage in interactive discussions with an individual with a known disability to determine appropriate accommodations, even if the individual does not make a request for accommodations. *See Chisolm v. McManimon*, 275 F.3d 315, 330 (3d Cir. 2001) (overturning summary judgment in favor of defendant when plaintiff had not requested an accommodation because the correctional facility "had knowledge of [plaintiff's] [ ] disability but failed to discuss related issues with him."); *Robertson v. Las Animas Cty. Sheriff's Dep't*, 500 F.3d 1185, 1197 n.10 (10th Cir. 2007) ("the critical component of the entity's knowledge is that it is aware not just that the individual is disabled, but that the individual's disability affects his ability to receive the benefits of the entity's services."); *but see Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 314, 319 (3d Cir. 1999) (finding, in the context of employment discrimination, an employer's duty to engage in interactive discussions is triggered by a request for an accommodation).

Parents claim the District did not provide advanced notice of the gifted evaluation, which arguably did not meet the school's duty to engage Parents in a discussion to search for reasonable accommodations, since the District was aware of L.B.'s disability and the fact that his disability could affect his gifted evaluation. However, the District did receive Parents' written approval to begin a gifted evaluation (Ex. S-36), and it seems Parents did not engage the District in a discussion of accommodations at that point. Nonetheless, even if the District had failed to engage Parents in a search for reasonable accommodations in L.B.'s gifted evaluation, such a failure does not impose liability under the ADA or RA unless a reasonable accommodation actually existed. *See Taylor*, 184 F.3d at 317-18; *Mengine v. Runyon*, 114 F.3d 415, 420 (3d Cir. 1997). Here, the Court need not decide whether the District failed to appropriately engage with Parents in a search for

accommodations in the gifted evaluation, since as described in the next section *infra*, Plaintiff has

not met its burden to show there was a reasonable accommodation sufficient to make L.B.

otherwise qualified for gifted education.[1]

    2.    *"Otherwise Qualified" for Gifted Education with Reasonable Accommodations*

To prove a claim of disability discrimination, Plaintiff must show that L.B. is otherwise

qualified to receive gifted services, meaning that a reasonable accommodation exists that would

enable L.B. to meet the Pennsylvania eligibility standards for gifted services. *See Millington v.*

*Temple Univ. Sch. of Dentistry*, 261 F. App'x 363, 366 (3d Cir. 2008) (citing *Zukle v. Regents of*

*the Univ. of Cal.*, 166 F.3d 1041, 1048 (9th Cir. 1999)); *see also Chin v. Rutgers*, 697 F. App'x

751, 754 n.4 (3d Cir. 2017) (describing a burden-shifting framework where if plaintiff proves she

is otherwise qualified, then the school has the burden to show the requested accommodations were

unreasonable). To prove that L.B. was otherwise qualified for gifted education, Parents must

demonstrate that their suggested accommodations to the gifted evaluation program are reasonable

and would enable L.B. to meet the eligibility requirements for gifted education. *See Pahlavan v.*

*Drexel Univ. Coll. of Med.*, 438 F. Supp. 3d 404, 423 (E.D. Pa. 2020) ("Where a plaintiff or his

expert are unable to forecast the likelihood of success with an additional accommodation in place,

---

[1]    The Court also notes that if there is a duty for interactive discussion, that duty is incumbent on both parties, and it is not clear Plaintiff met this standard either. *See Mengine*, 114 F.3d at 420 ("both parties have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith."). L.B.'s mother testified that after receiving the District's gifted evaluation results, she did not attend future IEP meetings for L.B., seemingly because of displeasure with a comment by Dr. Schreiber that L.B. was a "typical" Radnor student. (*See* Tr. 151:14-152:3; *see also* Tr. 197:16-198:24; 234:23-236:8.) However, L.B.'s father and Plaintiff's counsel did attend a future Review of Evaluation Meeting in March 2019. (Ex. S-48.) There was no testimony at the hearing about that meeting. Therefore, it is not clear from the record to what extent Parents continued to engage with the District in good faith to search for or implement a reasonable accommodation of the gifted evaluation.

the proposed accommodation is unreasonable and fails to support that a student is otherwise qualified."). Parents have not met this burden.

Parents presented no examination or observation results, or any other form of objective metrics, to support their assertion that an evaluation relying on data-driven indices would indicate that L.B. shows gifted ability. Parents describe their preferred alternative methods of evaluation to include "Authentic Assessments", which the guidelines define as "[a] student evaluation technique using student products or performance instead of traditional standardized tests." Guidelines at 40. Parents also reference a "Skills Inventory" which the guidelines vaguely define as "[a]n instrument used to describe the student's aptitudes in areas such as leadership, creativity, communication, etc." *Id.* at 44. But Parents presented no evidence that these other evaluation tools would produce results that indicate L.B.'s gifted ability.

The guidelines make explicit that "[p]arents, at their own expense, may obtain an independent evaluation. The school district is required to consider this information when making decisions regarding student identification." *Id.* at 14. The testimony of L.B.'s parent indicates that parents consulted a psychologist, Dr. Lorraine Ball, during the spring of 2019 to independently observe L.B. (Tr. 139:4-140:1.) Dr. Ball met with L.B., conducted a classroom observation of L.B., met with the District neuropsychologist, Dr. Schreiber, and received L.B.'s IQ test data from the District. (*Id.* at 140:12-18, 198:25-199:12.) But L.B.'s parent testified that Dr. Ball did not conduct an independent evaluation of L.B. (*Id.* 140:2-11.) Instead, L.B.'s parent testified that she "decided to rely on the test of the District[,]" because she was concerned "we're going to have an argument as to which one was the correct number, so we felt the number that the District had was sufficient for us to move forward with." (*Id.*) There is no indication that Parents presented any findings or conclusions of Dr. Ball to the District. There is no report from Dr. Ball in the administrative record,

and she did not testify at the hearing. The only witnesses Plaintiff presented at the due process hearing were L.B.'s parents and L.B.'s psychiatrist, Dr. Ali. Dr. Ali testified only that he began treating L.B. with medication for ADHD and anxiety in September 2018—after the June 2018 gifted evaluation—and that, without medication, these disabilities would be likely to impact L.B.'s performance on academic tasks and testing. (*See id.* at 93:6-96:1.)

As for Parents' second requested accommodation—to customize the rating scale to look only at L.B.'s intellectual ability and creativity—the District contends that such an accommodation would "not only provide an inaccurate picture of L.B. but fails to provide the team with information needed to determine whether L.B. is in need of gifted educational services." (Def.'s Resp. to Pl.'s Mot. For J. on the Administrative R. [Def.'s Resp.] at 21.) The District does not specifically address whether this requested modification would fundamentally alter the nature of the gifted educational services, which is key to determining whether the District can be liable for failure to implement a reasonable accommodation. *See Berardelli*, 900 F.3d at 123. The gifted regulations specify that a student with an IQ below 130 is gifted if "multiple criteria as set forth" in the regulations indicate giftedness or other criteria "strongly indicate" gifted ability. 22 Pa. Code § 16.21(d). "Multiple criteria indicating gifted ability include" the enumerated five categories that the District considered. *See id.* § 16.21(e)(1)-(5). Therefore, it is not clear whether the District could exclude or ignore any of these five enumerated "multiple criteria" without fundamentally altering the nature of the gifted education program. But even assuming that Parents' requested accommodations are not a fundamental alteration, and taking those requested accommodations into account, the Court does not see sufficient evidence in the record to find that the accommodation of reviewing the remaining multiple criteria that Parents do not find discriminatory—assessments of intellectual ability and creativity, not including any data collected

in the SIGS—necessarily indicate L.B.'s gifted ability and need for gifted education.

The evidence in the gifted evaluation concerning L.B.'s intellectual ability and creativity as compared to other students can be summarized as follows. On standardized testing, L.B. received scores in the 96th percentile for reading and in the 74th percentile for math. (Ex. S-43 at 9.) L.B.'s second grade teacher testified that she typically looks for standardized test results in the 98th or 99th percentile as an indicator of gifted eligibility. (Tr. at 59:18-60:8.) L.B. was reading above grade level by one year or more but not two full years above grade level. (Ex. S-43 at 9.) L.B. was meeting grade level expectations for math. (*Id.* at 10.) In writing, L.B. earned a proficient rating on all three benchmark assessments, which was between 28 and 31 out of 36, and he "always show[ed] creativity in [] writing[,]" and "demonstrate[d] strong vocabulary, voice, and command of the English language." (*Id.*) Overall, the gifted evaluation relied heavily on L.B.'s intellectual abilities and creativity when it concluded that he was "doing well academically and has a particular strength in reading, is a creative writer and competent math student." (*Id.* at 11.) Nevertheless, the report concluded that "his academic achievement does not show educational needs beyond those available within the regular education enrichment opportunities." (*Id.*) Schreiber's letter to parents concerning the gifted evaluation results explained that "a student who is reading one or two years above grade level but has no other needs can be accommodated within the regular education classroom." (Ex. P-2.) The second grade teacher also testified that she did not see that L.B. needed further acceleration or enrichment beyond the general classroom. (Tr. 82:6-12.)

Even after focusing on the factors that Plaintiff argues demonstrate L.B.'s giftedness—specifically intellectual ability and creativity—Plaintiff still has not met its burden to prove that L.B.'s evaluation results indicate his gifted ability. The Court concludes that there is not sufficient extrinsic evidence in the record to justify overturning the District's conclusion that L.B. was not

eligible for gifted education, or the hearing officer's finding that L.B. was not excluded from gifted education because of his disability. *Cf. Jaffess v. Council Rock Sch. Dist.*, Civ. A. No. 06-143, 2006 WL 3097939, at *7 (E.D. Pa. Oct. 26, 2006) ("The Court recognizes the complexities inherent in evaluating children who may be both gifted and learning disabled, and the proper judicial response when confronted with this scenario is not to second-guess the educational experts or the state agency . . . .").

Parents have not shown that L.B. was otherwise qualified for gifted education—meaning that he would have been found gifted with the implementation of any reasonable accommodations. Parents did not request any reasonable accommodation that the District denied. Parents also did not request another gifted evaluation for L.B., even after L.B.'s psychiatrist Dr. Ali prescribed L.B. new medication to increase L.B.'s attention and on-task behavior, which might have improved his testing outcomes. (*See* Tr. 145:23-147:8, 197:12-15.) Parents have the right to request at least one gifted evaluation per school term, *see* 22 Pa. Code § 16.22(c), and when Plaintiff filed the due process complaint in September 2019, over a year had elapsed since the contested gifted evaluation in June 2018. During that time, there is no evidence Parents attempted to prove to the District that L.B. was qualified for gifted education, either by implementing their requested accommodations with a private evaluation, or by asking the District to implement their proposed accommodations.

### 3.  *Parents' Evidence of Discrimination on the Basis of Disability*

Plaintiff bears the burden to show that L.B. was both otherwise qualified to participate in gifted education and precluded from participating because of a disability. *See CG*, 734 F.3d at 235 (3d Cir. 2013). As described in the previous section, Plaintiff has not proven L.B. was otherwise qualified. Nonetheless, the Court will briefly consider Plaintiff's evidence that L.B. was

discriminated against because of a disability.

Parents present two forms of evidence to support this contention: (1) the gifted written report for L.B.'s sibling, (Ex. P-1), and (2) Radnor's response to a Right-to-Know Law Request for information about gifted elementary students in the District. (Exs. P-4, P-5, P-6.) The hearing officer found these arguments were speculative and insufficiently supported. (*Id.* at 16.) The Court agrees.

### a. *The Gifted Evaluation Report of L.B.'s Sibling*

Parents state that L.B.'s sibling, who does not have a disability, was found eligible for gifted education despite having a "profile" that is "relatively similar" to L.B. and argue this demonstrates that the District's eligibility determination process discriminated against L.B. because of his disability. (Pl.'s Resp. at 22.) Evidence that a plaintiff was treated differently as compared to similarly-situated, non-disabled peers can be probative of disability discrimination. *See North v. Widener Univ.*, 869 F. Supp. 2d 630, 635 (E.D. Pa. 2012). But Plaintiff has not presented sufficient evidence to show that L.B. and his sibling are similarly situated students that were treated differently.

The Gifted Written Report for L.B.'s brother shows that he received a full scale IQ test score of 126 and was recommended for gifted educational services based on an analysis of the other multiple criteria. (Ex. P-1 at 7-8.) Parents argue that L.B.'s brother was found eligible for gifted services using a different rubric than L.B., and one that did not use "numerical scores", which Parents argue "suggests that the criteria are not immutable and could easily be customized when the District chooses to do so." (Pl.'s Mot. at 27.) In fact, the gifted assessment of L.B.'s sibling does involve a numerical rating scale from his classroom teacher called the "Gifted Rating Scale—School Form (GRS-S)." (Ex. P-1 at 6-7.) This numerical rating system was not identical

to the SIGS, but the evaluation was also from the year prior to L.B.'s evaluation, so this does not indicate that similarly situated students were given different assessments in the same year. On this numerical rating scale, L.B.'s sibling was rated by his classroom teacher as having a "high probability of falling within the gifted range" for intellectual ability, academic ability, and creativity. (*Id.* at 6-7.) As compared to L.B.'s gifted evaluation report described above, this extrinsic evidence does not prove the siblings are similarly situated. Because Parents have not shown L.B. and his sibling were similarly situated, the fact that L.B.'s sibling was provided gifted education is not sufficient to carry Parents' burden that L.B. was discriminated against because of his disability.

### b. *Gifted Education of Students with Disabilities in the District*

Parents next argue that "the small number of students with IEPs" who also receive gifted educational services in the District "suggests that the systemic disparate treatment of students with disabilities may have been a factor in the District's failure to accommodate L.B.'s disabilities." (Pl.'s Mot. at 27.) In support of this argument, Parents present Radnor's response to a Right-to-Know Law Request for information about gifted elementary students in the District. (Ex. P-6.) The response lists the number of students identified as gifted at each of the three elementary schools in the District and indicates how many of those students also have IEPs between 2016 and 2018. (Ex. P-6 at 1-2.) At L.B.'s school, two out of 44 gifted students had IEPs in June 2017, one out of 43 gifted students had an IEP in June 2018, and four out of 43 gifted students had an IEP in December 2018. (*Id.*) However, the record does not include the total number of students in each school that have an IEP or were identified as gifted. Therefore, the Court has no means to determine whether a disproportionately low number of students with IEPs were identified as gifted in the District or at L.B.'s school. Plaintiff's evidence is not sufficient to show any systemic disparate treatment.

In order to sustain an RA or ADA claim, it was Parents' burden at the due process hearing—as it is in this Court—to show that L.B. was otherwise qualified for gifted education and was discriminated against because of a disability. There is insufficient evidence in the record to sustain Parents' burden, so the Court will deny those claims.

### C.  The IDEA Claim

The IDEA offers federal funds to States that provide a free appropriate public education ("FAPE") to all children with disabilities in the State. *See* 20 U.S.C. § 1412(a)(1). An IEP serves as the "primary vehicle" for providing each child with a FAPE under the IDEA. *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 749 (2017) (quotation omitted). Plaintiff contends that Radnor violated the IDEA by failing to deliver an adequate IEP to L.B. Specifically, Parents argue that the District failed to provide L.B. with the specially designed instruction and services he needed to decrease his distractibility and lack of focus in the classroom, which were manifestations of his disabilities. (*See* Pl.'s Mot. at 28.)

First, the Court will consider certain arguments concerning goals in L.B.'s IEPs that Parents failed to exhaust at the due process hearing. Second, the Court will consider the hearing officer's findings concerning the District's delivery of services in the IEPs and L.B.'s gifted education evaluation. The Court agrees with the hearing officer's conclusions that Radnor did not deny L.B. a FAPE by either failing to provide services that would prevent L.B.'s disability from masking his giftedness or finding L.B. ineligible for gifted education.

#### 1.  *Failure to Exhaust Claims about IEP Goals*

Plaintiff's jurisdiction in this Court is premised on exhaustion of IDEA administrative procedures. (Compl. ¶¶ 2-3.) "Following completion of the IDEA's administrative process, *i.e.*, exhaustion, the IDEA affords '[a]ny party aggrieved by the findings and decisions' made during

or pursuant to the impartial due process hearing an opportunity for judicial review." *Batchelor v. Rose Tree Media Sch. Dist.*, 759 F.3d 266, 272 (3d Cir. 2014) (quoting 20 U.S.C. § 1415(i)(2)(A)). Ordinarily, "a federal court may not exercise subject-matter jurisdiction over the dispute unless state administrative remedies have been exhausted." *D.M. v. New Jersey Dep't of Educ.*, 801 F.3d 205, 212 (3d Cir. 2015). However, "[e]xhaustion is not required in very limited circumstances, such as where exhaustion is futile or inadequate, where the question presented is purely legal, where the administrative process cannot grant relief, or where exhaustion would work a severe or irreparable harm upon a litigant." *Id.* (citing *Komninos by Komninos v. Upper Saddle River Bd. of Educ.*, 13 F.3d 775, 778 (3d Cir. 1994)).

Plaintiff here raises alleged violations of the IDEA that were not presented at the due process hearing. Specifically, Parents argue that: (1) L.B.'s first grade IEP did not include any goals related to inattention or distractibility; and (2) L.B.'s second grade IEP included a goal for on-task behavior that was only to be implemented during social skills instruction in small group time, rather than across the entire school day. (Pl.'s Resp. at 25-27.) As a result, Parents argue that L.B. regressed in on-task behavior in second grade, which affected his performance in testing for gifted education. (*Id.* at 27.)

At the due process hearing, the District objected to the scope of the IDEA claim that could be presented, and the hearing officer considered the issue on the record. The hearing officer stated:

> "As I understand the issues that were raised, there's one . . . that involves whether or not the decision with regard to giftedness violates the IDEA because the student's other disabilities may have impacted the result of that test. If the Parent is arguing that there are other violations of IDEA involving goals . . . that would be inappropriate given that we have limited issues to those two things."

(Tr. 32:5-20.) Plaintiff's counsel responded to confirm this scope of the IEP claim: "Yes. . . . [T]he issue is not the global appropriateness or inappropriateness of the IEP and all of the specially

27

designed instruction, but specifically the District's failure to address the effect of [L.B.'s] disabilities on his performance . . . [w]ith regard to the factors that the District considered in the giftedness determination." (*Id.* 32:25-33:15.) The hearing officer then reaffirmed that the IDEA claim before him did not involve denial of a FAPE with regard to IEP goals, to which Plaintiff's counsel responded, "Right." (*Id.* at 33:16-23.)

Plaintiffs' arguments concerning whether L.B.'s first and second grade IEPs contained appropriate goals related to inattention or distractibility are outside the scope of the IDEA claim presented at the due process hearing. These issues are also not subject to any of the exceptions for exhaustion—they are not purely legal questions, nor are they issues where the administrative process could not grant relief. If parents believed that L.B.'s first and second grade IEPs did not contain sufficient goals to address his inattention, they could have challenged those inadequate IEPs at a due process hearing. They did not. Instead, parents' due process complaint only asserted that "[t]he District's failure adequately to deliver specially designed instruction and supplementary aids and services in [L.B.'s] IEP may also have masked his giftedness." (Ex. S-49, ¶ 35.) The Administrative Complaint raised shortcomings with the school's *delivery* of L.B.'s IEP services; Plaintiff did not raise the IEPs' goals, so the hearing officer did not consider that issue.

The Third Circuit has spoken of the administrative exhaustion requirement for claims pursuant to the IDEA as an issue of subject-matter jurisdiction. *See D.M.*, 801 F.3d 205, 212 n.4 (3d Cir. 2015) ("because exhaustion is a question of subject-matter jurisdiction, it should have been addressed first; if exhaustion were required, the District Court would have lacked jurisdiction to enter the injunction."). Thus, the Court concludes that because Plaintiff did not administratively exhaust its claims concerning the goals contained in L.B.'s IEPs, the Court does not have jurisdiction to rule on those issues.

2.  *Delivery of IEP Services and Eligibility for Gifted Education*

Plaintiff also argues that Radnor's delivery of IEP services led to a violation of the IDEA. Specifically, Plaintiff argues the District did not adequately measure or report upon L.B.'s IEP goal for on-task behavior, or modify that goal to account for his failure to make progress, which Plaintiff argues affected his performance in the gifted evaluation and allowed his disability to mask his giftedness. (*See* Pl.'s Mot. at 28; Pl.'s Resp. at 26-27.) Upon review of the record evidence, the Court agrees with the hearing officer's determination that Plaintiff did not prove this alleged denial of a FAPE. (*See* Hr'g Decis. at 13.)

"To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017). This recent formulation from the Supreme Court reiterates the Third Circuit's longstanding precedent that an IEP "must be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential and individual abilities." *K.D. by & through Dunn v. Downingtown Area Sch. Dist.*, 904 F.3d 248, 254 (3d Cir. 2018) (quoting *M.R.*, 680 F.3d at 269). An IEP must set out measurable annual goals designed to enable a student to make progress in the general education curriculum, a description of how the child's progress toward meeting those goals will be measured, and a description of specialized instruction and services the student will receive. 20 U.S.C. § 1414(d)(1)(A)(i)(II)-(IV). An IEP team must review a student's IEP periodically, and at least once annually, to determine whether goals for a student are being achieved and revise the IEP as appropriate to address any lack of expected progress. *Id.* § 1414(d)(4)(A); 34 C.F.R. § 300.324(b)(1). However, a FAPE does not require school districts to offer "every special service necessary to maximize each handicapped child's potential . . . ." *Bd.*

*of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 199 (1982); *see Endrew F.*, 137 S. Ct. at 1001.

To address his inattention and distractibility, the specially designed instruction in L.B.'s second grade IEP included a token economy system with a chart that tracked L.B.'s on-task behavior and allowed him to earn reward time. (Ex. S-24 at 24.) L.B. also received the assistance of a paraprofessional aide throughout the day to assist with on-task behaviors. (*Id.* at 23.) There is no indication that Parents raised any concerns to the District regarding this specially designed instruction in the second grade IEP.

L.B.'s second grade IEP also included a goal to increase his time spent on task to be within 10% of a non-disabled peer. (*Id.* at 17.) Reports of progress on this goal were to be provided to parents on a trimester basis. (*Id.*) L.B. made "good progress" toward this goal during its first trimester of implementation. (Ex. S-38 at 3.) He started at a baseline of staying on task within 32% of a non-disabled peer in November 2017. (*Id.*) By late February 2018, he had an observed rate of staying on task within 22% of a non-disabled peer in five observations. (*Id.*) However, the next progress report demonstrates L.B. regressed backwards on this goal during the second trimester of its implementation; in early June 2018, he was on task at a rate of 34% as compared to non-disabled peers in three observations. (*Id.* at 4.) Thus, the first six months of the District's implementation of L.B.'s IEP did not enable him to meet his goal for staying on task within 10% of his non-disabled peers. But this fact alone is not sufficient to prove denial of a FAPE.

In order to provide L.B. a FAPE, the IEP team was required to review his IEP periodically to determine whether his goals were being achieved and revise the IEP as appropriate to address any lack of expected progress. *See* 20 U.S.C. § 1414(d)(4)(A); 34 C.F.R. § 300.324(b)(1). There is no evidence the District did not meet this standard. The District conducted trimester progress

reports of on-task behavior, as set forth in the IEP. Prior to the June 2018 progress report, there was no indication that L.B.'s specially designed instruction for this goal related to inattention needed reassessment. L.B. had made good progress toward this goal in the first trimester. The June 2018 progress report was the first indication that L.B. was backsliding in time on task. This progress report was the same month as L.B.'s gifted educational services evaluation. In light of this timeline, there is no evidence that, in advance of L.B.'s gifted evaluation, the District failed to meet its obligations to periodically review and revise L.B.'s IEP to address lack of progress in his time on task.

Moreover, the Court sees no extrinsic evidence in the record to justify overturning the hearing officer's finding of "credible and persuasive testimony . . . that the student's IEP was implemented . . . ." (Hr'g Decis. at 13.) The second grade teacher testified to an aide's implementation of the specially designed instruction to track and reward L.B.'s time spent on task through a behavior chart in her classroom. (Tr. 50:1-19.) She testified to reviewing the results of that behavior chart and having open lines of communication with L.B.'s parents about his progress. (*See id.* 51:14-54-18.)

L.B.'s gifted evaluation report specifically noted that L.B.'s "attention and persistence to task are the greatest factor interfering with his learning and productivity." (Ex. S-43 at 11.) It went on to describe that L.B. "has not been able to demonstrate a consistent need for enrichment even in the areas of preferred interest or academic strength because he struggles to maintain his engagement to show academic need." (*Id.*) The Court views these statements as evidence potentially linking L.B.'s inattention to his failure to qualify for gifted educational services. Therefore, the Court disagrees with the hearing officer's conclusion that there was no evidence L.B.'s distractibility could be masking his giftedness. (Hr'g Decis. at 13.) But even if L.B.'s

inattention was interfering with his ability to maximize his potential, the Court does not conclude this proves the District denied L.B. a FAPE. The fact that the specially designed instruction in L.B.'s IEP did not entirely eliminate his inattention or time off task does not mean the IEP was not reasonable or properly implemented. *See K.D.*, 904 F.3d 248, 256 (3d Cir. 2018) ("slow progress does not prove that [the student's] IEPs were not challenging enough or updated enough."). It bears remembering that "[a]ny review of an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal." *Endrew F*., 137 S. Ct. at 999. Parents have not shown that the specially designed instruction related to on-task behavior in L.B.'s second grade IEP was not reasonably calculated to allow L.B. to achieve meaningful educational benefits in light of his abilities. There is also no evidence in the record that the implementation of L.B.'s second grade IEP did not meet the procedural standards of the IDEA. Therefore, Parents have not proven the District denied a FAPE by failing to deliver IEP services that would prevent L.B.'s distractibility from impacting his eligibility for gifted educational services.

Finally, the Court agrees with the hearing officer's finding that Radnor's denial of gifted educational services to L.B. was not a denial of a FAPE. (Hr'g Decis. at 11-12.) As described in section III.B *supra*, Plaintiff did not prove that L.B. was otherwise qualified for gifted educational services. Therefore, Plaintiff has not shown that refusing to provide L.B. gifted educational services denied him meaningful educational benefits in light of his intellectual potential and individual abilities.

## IV.    CONCLUSION

For the foregoing reasons, the Defendant's motion for judgment on the administrative record is granted, and Plaintiff's motion for judgment on the administrative record is denied. An Order consistent with this memorandum will be docketed separately.